## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**BELINDA BAKER,** *et al.,*

      **Plaintiffs,**

                              **Case No. 1:18-cv-757**
      **v.**                        **JUDGE DOUGLAS R. COLE**

**BENSALZ PRODUCTIONS, INC.,**
*et al.,*

      **Defendants.**

## <u>OPINION AND ORDER</u>

This cause comes before the Court on Defendant Excel Sports Management LLC's ("Excel") Motion to Dismiss Plaintiffs' Amended Complaint (Doc. 15), Defendant Bensalz Productions, Inc.'s ("BSP") Motion to Dismiss Plaintiffs' Amended Complaint (Doc. 21), and Plaintiffs' Motion for Leave to File Second Amended Complaint and to Add Additional Parties (Doc. 40). For the reasons more fully discussed below, the Court **GRANTS IN PART** and **DENIES IN PART** Excel's and BSP's (collectively "Defendants'") Motions to Dismiss (Docs. 15, 21), and **DENIES** Plaintiffs' Motion for Leave to File Second Amended Complaint (Doc. 40). Accordingly, the Court **DISMISSES WITHOUT PREJUDICE** Plaintiffs' First Amended Complaint (Doc. 2).

## FACTUAL BACKGROUND

**A. Baker Contracts With Defendants To Co-Produce Finney The Starbreacher ("Finney").**

Plaintiff Belinda Baker is a resident of Warren County, Ohio. (Am. Compl., ¶ 5, Doc. 2, #142)[1]. Baker created Starborne Productions, LLC and Starbreacher Enterprises, LLC as umbrella companies for her film projects. (*Id.* at ¶ 6, #142–43). Both companies are organized under Ohio law, with their principal places of business located in Warren County, Ohio. (*Id.* at ¶ 6, #143). One such film project is the children's story Finney. (Am. Compl. at ¶ 31, #150). Finney is an "eco-conscious adventure" that is meant to "educate millions about the fragile state of the world's marine life and seas while entertaining and inspiring them with endearing characters and a heartwarming story." (*See* Doc. 9, #230).

Baker alleges, in 2011, she was introduced to Michael Skouras, a member of Bensalz Productions ("BSP") and an employee at Twenty-First Century Fox, Inc. ("Fox"), in relation to her Finney project. (Am. Compl. at ¶ 10, #143). After Baker shared her creative content with Skouras and the other two members of BSP— Richard Bennett and Eric Salzman—Skouras offered to help Baker as a co-producer and agent. (*Id.* at ¶ 14, #144). Skouras then introduced Baker to Casey Close, a member and officer at Excel Sports Management. (*Id.* at #145).

These people and entities—Skouras, BSP, Close, Excel, and Fox—all reside outside Ohio. Excel is a limited liability company organized under Delaware law, with

---

[1] The Amended Complaint contains duplicate paragraph numbering. (*See, e.g.*, Am. Compl., ¶¶ 155, 136, #190). To avoid confusion, this Court will always cite the PageID as well as the paragraph number in the Amended Complaint.

its principal place of business and headquarters located in New York. (Matus Decl., ¶ 3, Doc. 15-1, #316). Excel also maintains offices in California and Florida. (*Id.*). None of Excel's four members are citizens of Ohio. (*Id.* at ¶ 4). BSP is a limited liability company organized under New York law, with its principal place of business in New York. (Bennett Decl., ¶ 3, Doc. 21-3, #378). BSP's three members are citizens of Florida, New York, and Texas. (*Id.* at ¶ 4). Fox and its subsidiaries are likewise incorporated in Delaware and maintain a principal place of business in New York. (Second Am. Compl., ¶¶ 10–14, Doc. 40-1, #551–52). Both Skouras and Close are domiciled in New York. (*Id.* at ¶¶ 6, 8, #550).

Baker alleges that on October 31, 2011, she was led to believe that Skouras and Close would represent her as her agent on the Finney project. (Am. Compl. at ¶ 15, #145). The next month, on November 16, 2011, Close confirmed this belief via email. (*Id.* at ¶ 17). Bennett, on BSP's behalf, signed a contract on December 2, 2011, where BSP agreed to serve as co-executive producer for the Finney project ("Co-Production Agreement"). (Doc. 2, #202–04).

On December 12, 2011, Bennett also signed a non-disclosure agreement with Baker. (Doc. 9, #229). The parties dispute whether Bennett signed this NDA on BSP's behalf or not.[2] Baker claims this agreement required BSP, its agents, and employees—including Skouras, Close and Excel—to keep the Finney project confidential, to require all third-parties to sign an NDA before sharing details about the Finney project, and to properly document when and to whom they disclosed such

---

[2] BSP claims that it was not a party to the NDA and that Plaintiffs' copy of the agreement has been altered. (*See* Bensalz's Mot. to Dismiss, Doc. 21, #359–60. *Compare* Doc. 9, #229 *with* Doc. 21-4, #382).

details. (Am. Compl. at ¶ 22, #146–47). Skouras allegedly promised via email that the Defendants would diligently protect Plaintiffs' intellectual property and obtain non-disclosure agreements from those individuals with whom the Defendants discussed Baker's project. (*Id*. at ¶ 24, #147).

While it is unclear from the complaint, Plaintiffs argue in their papers here that both contracts (the NDA and Co-Production Agreement) were negotiated via electronic communications with Baker while she resided in Ohio. (*See* Pls.' Memo. in Opp'n to Excel, Doc. 28, #486 ("Defendant Excel participated in extensive and ongoing contacts, negotiations, and planning by repeated telephone and email communications with Plaintiffs in Ohio throughout a two-year period."); Pls.' Memo. in Opp'n to Bensalz, Doc. 30, #508 (same)). Plaintiff does not assert that any of the Defendants' representatives were in Ohio when they sent those communications.

## B. During A Meeting In New York City, Skouras Allegedly Sexually Assaulted Baker.

On December 20, 2011, Baker met with Defendants' agents (Skouras and Close) at Excel's office in New York City to discuss the deal. (Am. Compl. at ¶ 18, #145). Skouras and Close reviewed the project in detail and solidified their commitment to represent Baker and secure financing and a production deal for the Finney project. (*Id*.). The two men allegedly convinced Baker to trust them by "dropping names of well-known film studios and celebrities that they alleged to know and promised to reach out to[.]" (*Id*. at ¶ 19, #146). During this meeting, Close told Baker that Finney could become the "Lion King of the Seas." (*Id*. at ¶ 32, #150).

Baker claims Skouras made several promises, including to peddle the Finney project to his top-level connections at Fox, all while "rub[bing her] back and arms in a way she found uncomfortable and suggestive, even brushing his hand across her breast as he was doing so." (*Id.* at ¶ 147, #196–97). Baker thought Skouras's "quid pro quo messages were tacit but clear; if you're nice to me, i.e. sexually, I will get your deal done and provide publicity for you and your project[.]" (*Id.* at #197) (quotations omitted). Baker alleges that the messages became less tacit and even more clear when Skouras forcibly pushed himself up behind Baker in an elevator "to rub and brush himself up against her and grope her buttocks[.]" (*Id.* at ¶ 148, #197; *see also id.* at ¶ 75, #171). The harassment allegedly continued "throughout 2012." (*Id.* at ¶ 148, #197).

**C.    The Parties' Contractual Relationship Turns Sour.**

Skouras purportedly broke his promise to Baker and violated the NDA by sharing information about the Finney project without first obtaining Baker's permission or requiring that the individuals to whom he disclosed the materials sign an NDA. For example, Skouras supposedly shared Plaintiffs' project with Harvey Weinstein without Baker's prior knowledge or permission. (*Id.* at ¶ 25, #147–48). Skouras also told Baker "in 2011 and 2012" via email that he had shared information with Lis Wiehl, a professional author and former Fox News legal analyst, without having Wiehl sign an NDA. (*Id.* at ¶ 27, #149). Baker expressed concern to Close and Skouras about sharing information on the Finney project without her advance knowledge or permission, but they repeatedly told her not to worry and promised to

provide her with a list of the individuals with whom they had spoken. (*See, e.g.*, *id.* at ¶ 25, #148).

By May 2012, Plaintiffs created a pitch package for Defendants to use when discussing the Finney project with prospective investors and television producers. (*See id.* at ¶ 38, #154–55; Doc. 9, #230–39). Defendants promised they would send this pitch packet to Disney, Dreamworks, Sony, MGM, Paramount, Blue Sky, and several other studios, but Baker never received proof that Defendants actually sent the pitch packet or, if so, that the studios had signed NDAs before receiving the materials. (Am. Compl. at ¶ 39, #155). Baker alleges she repeatedly attempted to check on Defendants' progress in finding a production company for her film, but Defendants continued to provide her "insincere and lame excuse[s]." (*Id.* at ¶ 45, #158). As late as October 2012, Defendants continued to claim they had sent the script to producers like Bruce Berman of Village Road Show. (*Id.* at ¶ 51, #162). Baker later discovered that Defendants never sent Berman the script. (*Id.* at ¶ 61, #166–67).

Eventually the relationship became openly hostile. Baker claims Skouras warned her that if she "remotely question[ed] him or anyone he brought in to the project" that Skouras would "retaliate so hard" that Baker "would not know what hit her." (*Id.* at ¶ 47, #158). Salzman and Skouras repeatedly told Baker, "[w]e have a contract and we will sue you!" (*Id.* at #159). In July 2012, Skouras emailed Gary Rhein, one of Baker's associates, and stated he was "pissed off" at Baker and how Baker should hope that Skouras would not "crush her project right then." (*Id.* at ¶ 49, #160).

6

By October 2012, "things had really fallen apart between Ms. Baker and the Defendants." (*Id.* at ¶ 60, #165). On October 2, 2012, Salzman told Baker she was "too batshit crazy for anyone to deal with." (*Id.* at #166). He also threatened legal action, saying "we have a contract and we will sue you." (*Id.*). According to Baker, the next month, in November 2012, Skouras told her that "her project was dead," he was "killing her project," and he planned on "letting every studio know his opinion of her." (*Id.* at ¶ 66, #168). Specifically, that she was "unfit for the film industry," "a clueless, crazy bitch," and "a complete waste of time." (*Id.*). At this point, in November 2012, their working relationship had ended. (*See id.* at ¶ 81, #174; Baker Decl., Doc. 30, ¶ 3, #514).

Baker vaguely alleges that "[s]ince parting ways with the Defendants, [she] has continued to experience interference and disruption in her business efforts on account of Defendants[.]" (Am. Compl. at ¶ 86, #175). She also claims that on April 24, 2018, BSP and Salzman sent her a "nefarious link to spyware/malware" as an "intentional aggressive act" to "instill fear [in] and intimidate" Baker. (*Id.* at ¶ 87).

## D. Procedural History And Pending Motions.

Plaintiffs filed what was originally a pro se complaint[3] on November 5, 2018. (Doc. 1). They subsequently amended their complaint as of right on December 20,

---

[3] Although that fifty-five-page complaint says it was filed "by and through counsel" (*see* Compl., Doc. 1, #1), it was signed by "Belinda R. Baker" as a "Pro Se litigant." (*See id.* at #55). Corporate entities cannot appear pro se. *See Doherty v. Am. Motors Corp.*, 728 F.2d 334, 340 (6th Cir. 1984) ("The rule of this circuit is that a corporation cannot appear in federal court except through an attorney.); *Ward v. Intercontinental Mortg. Grp., LLC*, No. 1:09-cv-473, 2012 WL 3025098, at *1 (S.D. Ohio July 24, 2012) (noting that limited liability companies cannot appear in federal court except through an attorney) (citing *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 202 (1993)). As described more fully below, Plaintiffs subsequently retained counsel, and are currently represented by that counsel.

2018.[4] (Doc. 2). In their Amended Complaint, Plaintiffs assert eight claims: (1) breach of the NDA against BSP, (2) breach of the Co-Production Agreement against BSP and Excel, (3) fraud against BSP and Excel, (4) breach of fiduciary duty against BSP and Excel, (5) intentional infliction of emotional distress against BSP, (6) civil conspiracy against BSP and Excel, (7) tortious interference with business contracts and prospective economic relations against BSP and Excel, and (8) a violation of New York gender-based violence and Human Rights laws against BSP.

Excel and BSP each subsequently filed Motions to Dismiss under Fed. R. Civ. P. 12(b)(2) and (6). In its Motion filed March 11, 2019, Excel argues that (1) this Court cannot exercise personal jurisdiction over Excel, (2) Starborne and Starbreacher are not proper parties, (3) Plaintiffs' breach of contract, breach of fiduciary duty, fraud, and tortious interference claims are barred by the statute of limitations, and (4) Plaintiffs fail to state a claim for their breach of contract, fraud, breach of fiduciary duty, tortious interference, civil conspiracy, and New York City Gender-Based Violence Act and Human Rights Laws claims. (*See* Excel's Mot. to Dismiss, Doc. 15). BSP makes similar arguments in its Motion filed March 27, 2019, including: (1) this Court has no personal jurisdiction over BSP, (2) Starborne and Starbreacher cannot file pro se, (3) Plaintiffs' claims are barred by the applicable statutes of limitations, and (4) Plaintiffs' fail to state a claim for breach of contract, fraud, breach of fiduciary duty, intentional infliction of emotional distress, civil conspiracy, tortious

---

[4] The Amended Complaint again purports to be filed "by and through counsel," but is signed by Baker as a pro se litigant. (*See* Am. Compl. at #141, 199–200).

interference, or violation of New York City Gender-Based Violence Act and Human Rights Laws. (*See* Bensalz's Mot. to Dismiss, Doc. 21).

Plaintiffs then retained counsel, who filed a notice of appearance on April 1, 2019. Through counsel, Plaintiffs responded to each Motion to Dismiss in turn. First, on April 23, 2019, Plaintiffs extensively argued that this Court does have personal jurisdiction over Excel. (*See* Pls.' Memo. in Opp'n to Excel, Doc. 28, #477–87). But, instead of responding to Excel's arguments aimed at the substance of Plaintiffs' complaint (how it fails to state a claim), Plaintiffs stated "they will presently seek leave of the Court to amend their Complaint a second time, which will render the remainder of Defendant Excel's motion to dismiss moot." (*Id.* at #487–88). Similarly, on May 9, 2019, Plaintiffs only responded to BSP's jurisdictional arguments. (*See* Pls.' Memo. in Opp'n to Bensalz, Doc. 30). Plaintiffs again stated, "they will presently seek leave of the Court to amend their Complaint a second time, which will render the remainder of Defendant Bensalz's motion to dismiss moot." (*Id.* at #512).

Several months passed before Plaintiffs filed a motion seeking leave to amend their complaint. On October 9, 2019, "[b]ased on additional facts and information discovered during the pendency of this litigation," Plaintiffs sought leave to amend their complaint and name additional defendants: Mike Skouras and Casey Close personally, as well as Fox and various Fox entities. (*See* Pls.' Mot. for Leave to File Second Am. Compl. and Add Additional Parties, Doc. 40, #544). They also want to add claims for misappropriation of trade secrets, a violation of the Defend Trade Secrets Act, negligent infliction of emotional distress, and vicarious liability, while

9

withdrawing their claims for breach of contract under the Co-Production Agreement, fraud, and civil conspiracy. (*Id.* at #544–45). Even though Plaintiffs made changes to their factual allegations in their proposed Second Amended Complaint, they did not put any further evidence regarding personal jurisdiction into the record.

This Court first considers the Defendants' Motions to Dismiss—specifically, Defendants' arguments that this Court lacks personal jurisdiction over Defendants. Because this Court agrees with Defendants that it lacks personal jurisdiction, this Court **GRANTS IN PART** Defendants' Motions (Docs. 15, 21) on Rule 12(b)(2) grounds only. Thus, this Court denies the rest of Defendants' Motions and Plaintiffs' Motion for Leave as moot.[5]

## DISCUSSION

## I. Defendants' Motions To Dismiss For Lack Of Personal Jurisdiction.

### A. Standard Of Review.

When faced with a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of proving personal jurisdiction exists over each defendant. *CompuServe Inc. v. Patterson*, 89 F.3d 1257, 1261–62 (6th Cir. 1989). A Rule 12(b)(2) motion "may be heard and determined before trial, but [] the court

---

[5] The Court recognizes that Plaintiffs' Motion for Leave includes a request to add additional parties. Those individuals and entities, though, are not yet parties to this action. That being said, based on the allegations in the Amended Complaint, which discuss the alleged actions by those individuals and entities, it appears that there may be personal jurisdiction issues with these potential new defendants, as well. At the same time, those parties, not having been served, have not had an opportunity, or a reason, to lodge any such arguments. Accordingly, this Order does not address whether personal jurisdiction does, or does not, exist over those other parties. Nor does this Order address whether the Defendants, who this Order dismisses without prejudice for lack of jurisdiction, may be necessary and indispensable parties in an action by Plaintiffs against those other parties. If, once this action is dismissed, Plaintiffs file a new action against the parties identified as proposed additional parties here, such issues can be addressed at that time.

has the power to defer [the] hearing of evidence and a ruling on the motion until trial." *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989). "As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court." *Id.* (quoting *Gibbs v. Buck*, 307 U.S. 66, 71–72 (1939)).

If the court "decides that the motion can be ruled on before trial," and "rules on the motion without an evidentiary hearing, the plaintiff need only make a *'prima facie'* case that the court has personal jurisdiction." *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012). Under that standard, the court should deny the motion to dismiss so long as the plaintiff sets forth "sufficient facts that support a finding of jurisdiction." *Kroger Co. v. Malease Foods Corp.*, 437 F.3d 506, 510 (6th Cir. 2006); *see also Neogen Corp. v. Neo Gen Screening, Inc.,* 282 F.3d 883, 887 (6th Cir. 2002) (explaining that a plaintiff makes a *prima facie* showing by "establishing with reasonable particularity sufficient contacts between [the defendants] and the forum state to support jurisdiction"). But the plaintiff may not rest on his pleadings to answer the movant's affidavits. Instead, the plaintiff must set forth "sufficient facts" establishing jurisdiction (typically by providing affidavits). *Serras*, 875 F.2d at 1214. If the court elects to resolve the motion without an evidentiary hearing, the court must view the pleadings and affidavits in the light most favorable to the plaintiffs, although the court may consider the defendant's undisputed factual allegations. *Conn*, 667 F.3d at 711; *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000).

11

This "prevent[s] non-resident defendants from avoiding jurisdiction simply by filing an affidavit that denies all jurisdictional facts." *CompuServe*, 89 F.3d at 1262.

### B.  Plaintiffs Have Failed To Establish That This Court Has Jurisdiction Over Defendants.[6]

In a diversity action, the court looks to the forum state's laws to determine if personal jurisdiction exists. *Calphalon*, 228 F.3d at 721. As the forum here is Ohio, personal jurisdiction exists only if such jurisdiction is consistent with both Ohio's long-arm statute and the Fourteenth Amendment's Due Process Clause. *Id.* The Plaintiff must clear both the statutory and the constitutional hurdles, and the Court is free to consider them in either order. *See Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991) (considering jurisdiction under the Due Process Clause first because a defect under this analysis "would foreclose the exercise of personal jurisdiction even where a properly construed provision of the long-arm statute would otherwise permit it"). Starting with the latter, the Court concludes Defendants are correct that the exercise of jurisdiction over them on the facts here would violate the Fourteenth Amendment's Due Process Clause. Given that determination, the Court finds it unnecessary to analyze personal jurisdiction under Ohio's long-arm statute.

#### 1.  Plaintiff Cannot Show Sufficient Minimum Contacts To Support Either General Or Specific Jurisdiction Under The Constitution.

The federal Due Process Clause requires that, before a Court exercises jurisdiction over a party, the Court must determine that the party had sufficient

---

[6] The Defendants make essentially the same arguments challenging personal jurisdiction, so this Court will consider their Motions together.

contacts with the forum state so that finding personal jurisdiction would not offend "traditional notions of fair play and substantial justice." *Third Nat'l Bank in Nashville v. WEDGE Grp., Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Personal jurisdiction under the Constitution comes in two flavors: (1) general personal jurisdiction (i.e., jurisdiction independent of whether the cause of action arises out of the defendant's contacts with the forum state), and (2) specific jurisdiction (i.e., jurisdiction over a cause of action that arises out of a defendant's contacts with the forum state). *Id.* Neither is present here.

### a. Plaintiffs Cannot Establish General Personal Jurisdiction Over Defendants, As Defendants Are Not "At Home" In Ohio.

A court may assert general personal jurisdiction over foreign corporations under the Due Process Clause when their "affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quotations omitted). "At home in the forum State" typically means either the corporation's principal place of business or formal place of incorporation is located there. *Id.* at 139. The Supreme Court, however, has noted the possibility that "in an exceptional case, … a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." *Id.* at 139 n.19.

To illustrate the latter point, the *Bauman* Court used the Court's earlier decision in *Perkins v. Benquet Consol. Mining Co.*, 342 U.S. 437, 448 (1952). *Id.* Benquet was incorporated in the Philippines, where it operated gold and silver mines. It ceased its mining operations during the Japanese occupation of the Philippines in World War II. Benquet's president moved to Ohio, started up an office, and oversaw the company's activities from there. *Perkins*, 342 U.S. at 448. Perkins, an Ohio resident, sued Benquet on a claim that did not arise in Ohio and did not relate to Benquet's activities in Ohio. The Supreme Court held that Ohio courts could exercise general jurisdiction over Benquet without offending due process because "Ohio was the corporation's principal, if temporary, place of business." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779 n.11 (1984) (citing *Perkins*, 342 U.S. at 448).

*Perkins* opens the possibility that a foreign defendant could have a "temporary" or "constructive" "home" in a state based on exceptional circumstances. That appears to be what Plaintiffs argue here. They claim Defendants are "an entirely different kind of organization, to which the paradigm of a place of incorporation or principal place of business should not apply." (Pls.' Memo. in Opp'n to Excel at #482). They argue that Excel is a company "that trades on its national impact and 'connections'," maintains high-profile Ohio clients, and has members serving on various boards in Ohio. (*Id.* at #482–83). Plaintiffs also claim that, besides one short fitness video, BSP's only business dealings ever have been this relationship with Plaintiffs. (Pls.' Memo. in Opp'n to Bensalz at #506). Plaintiffs argue that all these connections "are of such

a substantial nature as to render the corporation 'at home' in Ohio." (Pls.' Memo. in Opp'n to Excel at #483).

This Court disagrees. "It is one thing to hold a corporation answerable for operations in the forum State, [it is] quite another to expose it to suit on claims having no connection whatever to the forum State." *Daimler*, 571 U.S. at 139 n.19. The latter is, of course, the result that would follow if the Court were to find general jurisdiction over Defendants here—both of them would ostensibly be subject to jurisdiction in Ohio, even for matters not related to any contact with the State. While it may well be true that Excel's partners attended Ohio universities, or serve on Ohio boards, or that Excel has a few (unrelated) clients in Ohio, these Ohio connections do not make this the kind of "exceptional case," *see Daimler*, 571 U.S. at 139 n.19, that would transform Ohio into Excel's "home", temporary or otherwise, thereby opening Excel to suits of all manners and kinds in Ohio courts.

As for BSP, even if Plaintiffs are correct that BSP's only business dealings are those that it undertook with Plaintiffs (who are Ohio citizens), those dealings are likewise not substantial enough to render BSP "at home" here. The only Ohio-focused activity, even under Plaintiffs' account, was BSP's solicitation of business (and later communications about that business) with an Ohio resident. All of BSP's other activities occurred outside the State. That is simply too thin a reed to support the notion that BSP created a "temporary home" in Ohio like the Supreme Court found in *Perkins*.

15

Accordingly, Plaintiffs failed to establish that this Court has general personal jurisdiction over Defendants.

### b. Plaintiffs Cannot Establish Specific Personal Jurisdiction Over Defendants.

That still leaves the question of specific jurisdiction. Specific jurisdiction requires a lesser showing of contacts, as the court's power over the out-of-state defendant in the specific-jurisdiction setting is limited to the causes of action that arise out of those contacts. *See Third Nat'l Bank*, 882 F.2d at 1089. As both parties acknowledge, the Sixth Circuit has adopted a three-part test for determining whether the exercise of specific personal jurisdiction over a defendant comports with due process: (1) the defendant must have purposefully availed himself of the privilege of acting in the forum state or purposefully caused a consequence in the forum state; (2) the cause of action must arise from the defendant's activities there; and (3) the defendant's acts or consequences must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. *Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co., Ltd.*, 91 F.3d 790, 794 (6th Cir. 1996) (citing *Southern Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)). A party seeking to hale an out-of-state defendant into court must establish each of these three elements. Here, Plaintiffs fail to show any.

### i. *Defendants have not purposefully availed themselves of Ohio law.*

Purposeful availment requires that a defendant's contacts with the forum state "proximately result from actions by the defendant *himself* that create a substantial

16

connection with the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (emphasis in original) (quotation omitted). This ensures that a defendant will not be "haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Id.* Where a defendant deliberately engages in significant activities within a state or creates continuing obligations between himself and residents of the forum state, "he manifestly has availed himself of the privilege of conducting business there." *Id.* at 475–76. If the defendant's efforts are "purposefully directed" towards residents of a state, then the absence of physical contacts between the defendant and that state would not defeat personal jurisdiction. *Id.* at 476.

The purpose of requiring such contacts is twofold. First, "[i]t protects the defendant against the burdens of litigating in a distant or inconvenient forum." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). Second, it protects the defendant against attempts by states to "reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *Id.* Plus, if a defendant has purposefully availed itself of the protection of the forum state, it "has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to consumers, or, if the risks are too great, severing its connection with the State." *World-Wide Volkswagen*, 444 U.S. at 297.

Here, Plaintiffs make two arguments to show purposeful availment: Excel and BSP (1) "participated in extensive and ongoing contacts, negotiations, and planning by repeated telephone and email communications with Plaintiffs in Ohio throughout

17

Case: 1:18-cv-00757-DRC Doc #: 53 Filed: 03/06/20 Page: 18 of 26  PAGEID #: 666

a two-year period," and (2) chose to target an Ohio resident and business.[7] (*See* Pls.' Memo. in Opp'n to Excel at #485–86; Pls.' Memo. in Opp'n to Bensalz at #508–09). Considered separately or together, that is not enough.

It is well settled that the mere existence of a contract with a citizen of a foreign state is not enough to show purposeful availment, *see Burger King*, 471 U.S. at 478, and Plaintiffs do not argue otherwise here. Rather, Plaintiffs point to Defendants' acts surrounding that contract (communications that occurred in negotiating and performing the contract). Under Sixth Circuit precedent, that is certainly the correct starting point. *Bridgeport Music, Inc. v. Still N The Water Pub.*, 327 F.3d 472, 482 (6th Cir. 2003) (noting that courts should focus on the defendant's actions in the negotiation and performance of the contract in determining jurisdiction). But, in that regard, the Sixth Circuit has also held that the mere fact that an out-of-state party had contacts with an in-state party to negotiate an agreement "is not of controlling significance." *LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1300 (6th Cir. 1989). Rather, such contacts often amount to "precisely the sort of 'random,' 'fortuitous' and 'attenuated' contacts that the *Burger King* Court rejected as a basis for haling non-resident defendants into foreign jurisdictions." *Id.* at 1300–01. Accordingly, a court must undertake a holistic analysis of the totality of the circumstances surrounding the prior negotiations and contemplated future consequences, the terms of the contract, and the parties' actual course of dealing when determining if the defendant

---

[7] Plaintiffs could have, but did not, make other arguments in support of specific personal jurisdiction over Defendants. Because they failed to do so, the Court considers any other arguments in support of specific personal jurisdiction waived.

purposefully established minimum contacts in the forum. *Nationwide Mut. Ins. Co.*, 91 F.3d at 795 (citing *Burger King*, 417 U.S. at 479).

To be sure, in *Cole v. Mileti*, the Sixth Circuit arguably reached a different conclusion. 133 F.3d 433 (6th Cir. 1998). There, the court proclaimed that if "a nonresident defendant transacts business by negotiating and executing a contract via telephone calls and letters to an Ohio resident, then the defendant has purposefully availed himself of the forum by creating a continuing obligation in Ohio." *Id.* at 436. Such language suggests that contract negotiations with a person who happens to be located in a particular state suffice to make the out-of-state defendant subject to suit for a cause of action arising out of the contract. Although there, it is perhaps worth noting, the out-of-state defendant had been an Ohio resident, and business associate of the plaintiff, for many years before moving to California, and the contract at issue involved the out-of-state defendant's purchase of personal property (shares in a company) that the Ohio plaintiff owned.

In any event, in subsequent cases, the Sixth Circuit has walked back any such broad reading of *Cole*. In particular, in later cases, the Sixth Circuit has distinguished between situations where the defendant has made contact with an Ohio-based plaintiff in order to exploit a market within the state, as opposed to situations where the defendant had contact with the state only because the plaintiff happened to reside there, with the latter cases constituting the type of "fortuitous" contacts that do not give rise to "purposeful availment." *See Calphalon*, 228 F.3d at 722; *McMunigal v. Bloch*, No. 1:09-cv-01674, 2010 WL 2106186, at *8 (N.D. Ohio May 25, 2010) (finding

the communications from defendant to plaintiff in Ohio about the contract occurred solely because the plaintiff happened to reside in Ohio, not because the defendant wished to create "continuous and substantial" consequences there) (citing *Calphalon*, 228 F.3d at 723); *Int'l Techs. Consultants, Inc. v. Euroglas S.A.*, 107 F.3d 386, 395 (6th Cir. 1997) ("[I]t was purely fortuitous that International Technologies happened to have a Michigan address."). In short, there is no per se rule that a contractual relationship with an in-state citizen, coupled with interstate communications related to that contract, automatically suffice to render an out-of-state defendant subject to personal jurisdiction where the plaintiff resides. *See McMunigal*, 2010 WL 2106186, at *9.

The Sixth Circuit's later decision in *Condon v. Flying Puck, LLC*, 35 F. App'x 173, 174 (6th Cir. 2002), is instructive on this point. There, like here, contract negotiations occurred between an out-of-state party and an Ohio resident. When the latter sued, the district court found it lacked personal jurisdiction, and the Sixth Circuit affirmed. In doing so, the Sixth Circuit distinguished *Cole*, finding that, unlike *Condon*, *Cole* had involved "an *ongoing* business relationship that lasted over ten years, so that their business transactions 'continuously arose from plaintiff's activities in Ohio.'" *Condon*, 35 F. App'x at 174. The contractual relationship in *Condon*, by contrast, lasted less than two years. *Id.* The instant case is more like *Condon* than *Cole*.

The point is simply this: to create personal jurisdiction, out-of-state defendants must purposefully avail themselves of—that is, they must choose to direct their

activities toward—the forum state. If instead they are choosing to direct their activities toward a particular person, and that person merely happens to live in the forum state, that is not enough. Yet that is all that Plaintiffs allege regarding Defendants' activities here.

Separately, Plaintiffs point to the NDA's Ohio choice-of-law provision to argue that Defendants contractually accepted personal jurisdiction in Ohio. But the Supreme Court has stated that such provisions, in and of themselves, are insufficient to establish jurisdiction. *See Burger King*, 471 U.S. at 482. The Sixth Circuit has likewise treated choice-of-law provisions as a relevant factor to consider, but not as dispositive. *See Calphalon*, 228 F.3d at 723; *CompuServe*, 89 F.3d at 1264. Here, the choice-of-law provision may tip in favor of jurisdiction, but it is insufficient to overcome the fact that Defendants' contacts with the forum state, even as characterized by Plaintiffs, constitute the sort of random, fortuitous and attenuated contacts that do not suffice to show purposeful availment.

### ii. *Plaintiffs' cause of action does not arise from Defendants' activities in Ohio.*

To establish personal jurisdiction, it is not enough for the plaintiff to show the defendant purposefully availed itself of the laws of the forum state. The plaintiff must also demonstrate that the cause of action arose from the defendant's activities in the forum state. *Southern Mach. Co.*, 401 F.2d at 381; *see also Calphalon*, 228 F.3d at 723. What exactly that means under Sixth Circuit case law is open to interpretation. Some cases seem to suggest that, in the breach of contract setting, this means that the activities constituting the breach must have occurred in Ohio. *See, e.g., Condon*,

35 F. App'x at 174 (finding this prong not satisfied because the breach of contract arose from the defendant's failure to compensate the plaintiff for work performed out of state); *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 152 (6th Cir. 1997) (finding this prong not satisfied because the defendant's alleged breach of contract by failure to pay the purchase price occurred out of state). Other cases, though, seem to adopt a more relaxed threshold, expressly stating that this criterion "does not require that the cause of action *formally* 'arise from' defendant's contacts with the forum." *Third Nat'l Bank in Nashville v. WEDGE Grp., Inc.*, 882 F.2d 1087, 1091 (6th Cir. 1989) (emphasis added).

This Court need not mine the possible distinction between these two approaches, though, as even under the more relaxed standard, "the cause of action, of whatever type, [must] *have a substantial connection with* the defendant's in-state activities." *Southern Machine Co.*, 401 F.2d at 384 n.27 (emphasis added). This turns on the relationship, if any, between the "operative facts" of the plaintiff's cause of action and the defendant's contacts with the forum. *See id.* at 384 n.29. To be sure, this relationship may give rise to jurisdiction even absent physical presence, but typically only where the Ohio-directed activities "form the 'heart' of the cause of action.'" *Int'l Corp. v. Henderson*, 428 F.3d 605, 617–18 (6th Cir. 2005) (quoting *Neal v. Janssen*, 270 F.3d 328, 333 (6th Cir. 2001)).

Here, Plaintiffs argue that "[a]s a direct and proximate result of Defendant[s'] [] active targeting of Plaintiffs, Defendant[s were] able to coerce Plaintiffs into partnering with [Defendants] as their agents and" partner/manager. (Pls.' Memo. in

Opp'n to Excel at #486; Pls.' Memo. in Opp'n to Bensalz at #509). The problem with this argument, though, is that it does not show how Defendants' activities that occurred in this forum have a "substantial connection" to the causes of action that Plaintiffs seek to assert in this suit. *Southern Machine Co.*, 401 F.2d at 384 n.27. To the contrary, Plaintiffs seem to concede that all the facts forming "the 'heart' of the cause of action" occurred out of state. *Int'l Corp.* 428 F.3d at 618.

Consider the contract claim. Even under Plaintiffs' version of the facts, the alleged Ohio-based activities principally related to the very initial steps of contract formation (i.e., the "targeting" of Plaintiffs in Ohio). Yet the contract claim here involves allegations of later breach, not problems related to contract formation. And, as to that breach, Plaintiffs do not allege, for example, that Defendants failed to follow the NDA and wrongfully disclosed information about the Finney project to people in Ohio or while Defendants themselves were in Ohio. To the contrary, to the extent that the parties have identified locations at all, the people to whom the Defendants sought to show Finney material apparently resided in California or New York. (*See* Bennett Decl. at ¶ 7, #379; Excel's Mot. to Dismiss at #287). Plaintiffs' allegations of sexual assault and tortious interference likewise arise from, and relate to, activities that allegedly occurred in New York, not Ohio.

Nor can Plaintiffs seek to rely on *Southern Machine's* language to the effect that an out-of-state defendant's out-of-state activities may suffice for jurisdiction if they have "a realistic impact on the commerce of that state." 401 F.2d at 382. Defendants' alleged activities here have virtually no impact on Ohio's commerce.

Again, here, the plan was to develop the Finney project through further activities either in California or New York, not Ohio.

In sum, Plaintiffs are unable to show that the "operative facts" relating to their causes of action have a "substantial connection with" Defendants' in-state activities. *Southern Machine Co.*, 401 F.2d at 384 n.27. Rather, the central facts relevant to Plaintiffs' claims—to use the Sixth Circuit's words, those facts that "form the heart of the cause of action," *Int'l Corp.* 428 F.3d at 618—occurred outside the state. Thus Plaintiffs fail under this prong, too.

### iii.  *Exercising personal jurisdiction over Defendants would be unreasonable.*

Because Plaintiffs failed to satisfy the first two prongs of the *Southern Machine* test—either of which is dispositive—this Court need not dwell on the third. *See LAK, Inc.*, 885 F.2d at 1303 ("[E]ach [*Southern Machine*] criterion represents an independent requirement, and failure to meet any one of the three means that personal jurisdiction may not be invoked."). Yet, it still merits mention, as it does not support jurisdiction either.

The third prong requires that the defendant have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant "reasonable." *See Southern Mach. Co.*, 401 F.2d at 381. While that term is admittedly amorphous, the Defendants appear to have essentially no ongoing connection with Ohio, as discussed in detail above. The most substantial connection is likely Defendants' contract with Plaintiffs. But the Supreme Court has stated, "[i]f the question is whether an individual's contract with an out-of-state party *alone* can

24

automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot." *Burger King*, 471 U.S. at 478. Just as the Sixth Circuit found in *Kerry Steel, Inc.*, to subject a New York defendant to suit in Ohio simply because the defendant contracted with an Ohio resident "would be far from reasonable." 106 F.3d at 152.

In an effort to address the vagueness inherent in the term "reasonable," the Supreme Court has instructed that the reasonableness inquiry should consider certain factors, including: (1) the burden on the defendant, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the States in furthering fundamental substantive social policies. *Burger King*, 471 U.S. at 477 (citing *World-Wide Volkswagen*, 44 U.S. at 292).

Here, considered overall, these factors likewise counsel towards finding that the exercise of personal jurisdiction over Defendants would be unreasonable. Plaintiffs admittedly have an interest in obtaining convenient and effective relief by litigating in Ohio. The burden on Defendants to litigate here, though, is high. Moreover, Ohio has no particular cognizable interest in adjudicating the dispute. To be sure, Ohio does have an interest in protecting its residents, but that would be true in any case involving an Ohio plaintiff. Beyond that, this case does not seem to involve, for example, novel questions of Ohio law or important recurring issues within this state. Finally, the interstate judicial system's interest in efficiency does not

25

counsel strongly in favor of this case being handled here versus elsewhere, and there does not appear to be any "shared interest of the States" at issue. In sum, based on the claims and the contacts alleged here, it would not be reasonable for this Court to exercise jurisdiction over the out-of-state Defendants.

## CONCLUSION

Because this Court finds it lacks personal jurisdiction over the Defendants, it denies as moot the remainder of Defendants' Motions to Dismiss regarding failure to state a claim and Plaintiffs' Motion for Leave to File an Amended Complaint. Thus, this Court **GRANTS IN PART** Defendants' Motions to Dismiss (Docs. 15, 21), **DENIES IN PART** Defendants' Motions to Dismiss (Docs. 15, 21), and **DENIES** Plaintiffs' Motion for Leave to File Second Amended Complaint (Doc. 40). Accordingly, the Court **DISMISSES WITHOUT PREJUDICE** Plaintiffs' First Amended Complaint (Doc. 2).

**SO ORDERED.**

March 6, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**